UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

**FILED**
**U.S. DISTRICT COURT**
**MIDDLE DISTRICT OF TENN.**

**AUG 01 2022**

DEPUTY CLERK

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | No. | 3:21-CR-00171 |
| v. | ) | | |
| | ) | JUDGE RICHARDSON | |
| | ) | | |
| [1] FADEL Y. ALSHALABI | ) | | |
| | ) | | |
| [2] EDWARD D. KLAPP | ) | | |
| | ) | | |
| [3] MELISSA L. CHASTAIN | ) | | |
| a/k/a "Lisa Chastain" | ) | | |
| | ) | | |
| [4] ROGER ALLISON | ) | | |
| | ) | | |
| [5] DAKOTA WHITE | ) | | |
| | ) | 18 U.S.C. § 2 | |
| [6] ROBERT ALAN RICHARDSON | ) | 18 U.S.C. § 371 | |
| a/k/a "Alan Richardson" | ) | 18 U.S.C. § 1347 | |
| | ) | 18 U.S.C. § 1349 | |
| [7] EDWARD BURCH | ) | 18 U.S.C. § 1957 | |
| | ) | 42 U.S.C. § 1320a-7b(b)(1)(A) | |
| [8] SAMUEL HARRIS | ) | 42 U.S.C. § 1320a-7b(b)(2)(A) | |

# SECOND SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

At all times material to this Second Superseding Indictment:

## BACKGROUND AND GENERAL ALLEGATIONS

### Parties and Associated Entities

1.      **[1] FADEL Y. ALSHALABI** was a resident of Waxhaw, North Carolina.

2.      **[2] EDWARD D. KLAPP** was a resident of Jupiter, Florida.

3.      **[3] MELISSA L. CHASTAIN**, a/k/a "Lisa Chastain," was a resident of Belton, South Carolina.

4. **[4] ROGER ALLISON** was a resident of Greenville, South Carolina.

5. **[5] DAKOTA WHITE** was a resident of Easley, South Carolina.

6. **[6] ROBERT ALAN RICHARDSON** was a resident of Silver Spring, Maryland.

7. **[7] EDWARD BURCH** was a resident of Rockville, Maryland.

8. **[8] SAMUEL HARRIS** was a resident of Salt Lake City, Utah.

9. Crestar Labs, LLC was a limited liability company organized under the laws of Tennessee with its principal place of business at 2001 Campbell Station Parkway, Suite C-2, Spring Hill, Tennessee 37174.

10. Karemore Labs, also known as Crestar Labs, Inc., was a laboratory at 12091 Somerset Avenue, Princess Anne, Maryland 21853.

11. Martis Analytics and Diagnostics LLC, also known as Crestar Labs, LLC, Texas, was a laboratory located at 1651 N. Collins Blvd., Richardson, Texas 75080.

12. Advanta Labs LLC ("Advanta Labs") was a laboratory located at 1651 N. Collins Blvd., Richardson, Texas 75080.

13. The headquarters for the Crestar-associated laboratories—namely Crestar Labs LLC, Karemore Labs, Martis Analytics and Diagnostics LLC, and Advanta Labs (collectively, "Crestar Labs")—was the location of Crestar Labs, LLC in Spring Hill, Tennessee, located within the Middle District of Tennessee.

14. **[1] ALSHALABI** was the owner, operator, and Chief Executive Officer of Crestar Labs.

15. **[2] KLAPP** was the Vice President of Sales for Crestar Labs between in or around January 2018 through in or around December 2019.

2

16.     **[5] WHITE** performed billing services for Crestar Labs from a separate company and was also employed as Director of Client Services and Vice President of Operations for Crestar Labs between in or around October 2018 through in or around January 2020.

17.     DNA Project Consulting LLC, d/b/a Genetix LLC ("Genetix"), was a marketing company based in Belton, South Carolina, that contracted with Crestar Labs, including Advanta Labs, to provide Crestar Labs with genetic testing samples from Medicare and Medicaid beneficiaries starting in or around November 2018 through in or around December 2019, and with Advanta Labs from at least January 2021.

18.     **[3] CHASTAIN** was the owner and Chief Executive Officer of Genetix.

19.     **[4] ALLISON** was the President of Genetix.

20.     Freedom Medical Labs, LLC, a/k/a Sole Marketing Services, LLC ("Freedom"), was a marketing company based in Silver Spring, Maryland, that contracted with Crestar Labs to provide Crestar Labs with genetic testing samples from Medicare and Medicaid beneficiaries in or around December 2018 through in or around December 2019.

21.     **[6] RICHARDSON** was a principal of Freedom.

22.     **[7] BURCH** was a principal of Freedom.

23.     Flojo Recruiting LLC, d/b/a Secure Health ("Secure Health"), was a marketing company based in American Fork, Utah, that contracted with Crestar Labs to provide Crestar Labs with genetic testing samples from Medicare and Medicaid beneficiaries in or around March 2019 through in or around February 2020.

24.     **[8] HARRIS** was the owner of Secure Health.

25.     Co-Conspirator #1 was a co-investor in Crestar Labs, as well as other laboratories, with **[1] ALSHALABI** between in or around December 2015 through in or around July 2019.

## The Medicare Program

26.     The Medicare Program ("Medicare") was a federal healthcare program that provided benefits to individuals who were sixty-five years of age or older, or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

27.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f).

28.     Medicare programs covering different types of benefits were separated into different program "parts." For example, "Part A" of the Medicare program covered health services provided by hospitals, skilled nursing facilities, hospices and home health agencies, "Part B" covered medical services by laboratories and physicians and is described in more detail below, "Part C," also known as "Medicare+Choice" and "Medicare Advantage" is described in further detail below, and "Part D" covered prescription drugs.

29.     Physicians, clinics and other health care providers, including laboratories, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services or items provided to beneficiaries.

30.     A Medicare claim was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the

4

beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

### Part B Coverage and Regulations

31.     "Part B" of the Medicare Program was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

32.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to Medicare beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

33.     Novitas Solutions Inc. ("Novitas") was the MAC for the consolidated Medicare jurisdictions that covered Colorado, Delaware, Louisiana, Maryland, Mississippi, New Jersey, New Mexico, Oklahoma, Pennsylvania, Texas, and Washington, D.C. Palmetto GBA ("Palmetto") was the MAC for the consolidated Medicare jurisdictions that included Alabama, Georgia, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia.

34.     To receive Medicare reimbursement, providers had to make appropriate application to the MAC and execute a written provider agreement. The Medicare provider enrollment

5

application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

35. CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

36. Payments under Medicare Part B could be made directly to the health care provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

## The Medicare Advantage Program

37. The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," provided Medicare beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans, including health maintenance organizations ("HMOs"), provider sponsored organizations ("PSOs"), preferred provider organizations ("PPOs"), and private fee-for-service plans ("PFFS"), rather than through the original Medicare program (Parts A and B).

38. Private health insurance companies offering Medicare Advantage plans were required to provide Medicare beneficiaries with the same services and supplies offered under Parts

A and B of Medicare. To be eligible to enroll in a Medicare Advantage plan, a person had to have been entitled to benefits under Part A and Part B of the Medicare Program.

39.     A number of companies, including Aetna, Inc. ("Aetna"), UnitedHealth Group, Inc. ("UnitedHealth"), Humana Inc. ("Humana"), WellCare Health Plans, Inc. ("WellCare") and CVS Health Corporation ("CVS Health"), along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to Medicare Advantage beneficiaries through various plans.

40.     Medicare Advantage plans, including Aetna, UnitedHealth, Humana, WellCare and CVS Health were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b), and "Federal health care program[s]," as defined by Title 42, United States Code, Section 1320a-7b(f).

41.     The health insurance companies, through their respective Medicare Advantage programs, often made payments directly to physicians, medical clinics, laboratories, or other health care providers, rather than to the Medicare Advantage beneficiary that received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

42.     To obtain payment for services or treatment provided to a beneficiary enrolled in a Medicare Advantage plan, physicians, medical clinics, laboratories, and other health care providers had to submit itemized claim forms to the beneficiary's Medicare Advantage plan. The claim forms were typically submitted electronically via the internet. The claim form required certain important information, including the information described above in paragraph 30.

43.     When a provider submitted a claim form to a Medicare Advantage program, the provider party certified that the contents of the form were true, correct, complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program,

7

including the Anti-Kickback Statute. The submitting party also certified on claim forms that the services being billed were medically necessary and were in fact provided as billed.

44.     The private health insurance companies offering Medicare Advantage plans were paid a fixed rate per beneficiary per month by the Medicare program, regardless of the actual number or type of services the beneficiary received. These payments by Medicare to the insurance companies were known as "capitation" payments. Thus, every month, CMS paid the health insurance companies a pre-determined amount for each beneficiary who was enrolled in a Medicare Advantage plan, regardless of whether or not the beneficiary utilized the plan's services that month. CMS determined the per-patient capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence. CMS adjusted the capitation rates annually, taking into account each patient's previous illness diagnoses and treatments. Beneficiaries with more illnesses or more serious conditions would rate a higher capitation payment than healthier beneficiaries.

45.     Medicare Part B and Medicare Advantage plans are collectively referred to as "Medicare" herein.

### The Medicaid Program

46.     The Medicaid Program ("Medicaid") was a federal and state funded health care program providing benefits to people who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. Medicaid was administered pursuant to Title XIX of the Social Security Act. CMS was responsible for overseeing the Medicaid program in participating states. The benefits available under Medicaid were governed by federal statutes and regulations, and by rules implemented by the

8

individual states. Individuals who received benefits under Medicaid were commonly referred to as Medicaid "beneficiaries."

47.     Each state Medicaid program was required to implement a "State Plan" that contained certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures. 42 U.S.C. § 1396a.

48.     The State of Georgia, acting through the Georgia Department of Community Health, administered the Georgia Medicaid program.

49.     The State of Colorado, acting through Department of Healthcare Policy and Finance, administered the Colorado Medicaid Program.

50.     The State of South Carolina, acting through the South Carolina Department of Health and Human Services, administered the South Carolina Medicaid program.

51.     The State of North Carolina, acting through the North Carolina Department of Health and Human Services, administered the North Carolina Medicaid program.

52.     The State of Tennessee, acting through the Tennessee Department of Finance and Administration, Division of TennCare, administered the Tennessee Medicaid Program.

53.     Providers were required to enroll in state Medicaid plans and agreed to abide by federal and state laws and plan rules and regulations, including the Anti-Kickback Statute, and to refrain from submitting false or fraudulent claims, including claims that were for medically unnecessary services.

54.     The state Medicaid programs are collectively referred to as "Medicaid" herein.

55.     Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f).

## Diagnostic Laboratory Testing

56. Cancer genomic ("CGx") testing was a genetic test that used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

57. Pharmacogenetic ("PGx") testing was a genetic test that detected specific genetic variations in genes that impacted the metabolism of certain medications. In other words, PGx testing helped determine, among other things, whether certain medications would be effective if used by a particular patient.

58. Genetic Testing for Cardiovascular Disease ("GTCD") screened for inherited cardiovascular disease that could indicate a potential cardiovascular condition and could have potential to assist patient management.

59. Urine Analysis ("UA") screened for certain types of disorders or diseases, such as urinary tract infections or kidney disease, and was used to help diagnose or monitor ongoing disease. Urine Drug Testing was a specific type of UA to detect the presence or absence of drugs or to identify specific drugs in urine samples and was commonly used to monitor patients in substance abuse treatment and inform treatment decisions. Laboratory Urine Drug Testing was commonly referred to as "toxicology" screening.

60. Medicare did not cover diagnostic testing, such as CGx testing, PGx testing, GTCD, or UA, that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(l)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms,

10

complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(l). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

61.     If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. In particular, "[a]ll diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." Title 42, Code of Federal Regulations, Section 410.32(a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

62.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

63.     Medicaid programs similarly only covered tests that were medically necessary and provided as represented.

64.     In submitting claims to Medicare or Medicaid, providers used a variety of Current Procedural Terminology "CPT" codes to indicate what CGx testing, PGx testing, GTCD (collectively, "genetic testing"), or UA had been performed.

11

## Telemedicine

65.     Telemedicine, or telehealth, provided a means of connecting patients to doctors and other medical providers by using telecommunications technology, to interact with a patient.

66.     During the majority of the timeframe of the conspiracy described below, Medicare covered expenses for specified telehealth services if certain requirements were met. These requirements included that: (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a licensed medical provider's office or a specified medical facility – not at a beneficiary's home – during the telehealth consultation with a remote provider.

67.     As a result of the global pandemic, effective March 6, 2020, CMS suspended these specific telehealth rules on a temporary and emergency basis, in order to facilitate wider access to care during the COVID-19 crisis to avoid unnecessary travel.   CMS still required actual communication with the patient.  For new patients, the medical provider was required to have an interactive audio and video telecommunications system that permitted real-time communication between the distant site and the patient at home.  For a virtual check in with an established medical provider, actual communication was required via telecommunication and there had to be an ongoing doctor-patient relationship between the medical provider and the beneficiary.  For an e-visit, actual communication had to occur through an online portal and there had to be an ongoing established doctor-patient relationship between the medical provider and the beneficiary.

68.     Telehealth services could be covered by and reimbursable under Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed medical provider and were reasonable and necessary to diagnose and treat a covered illness or condition.

# COUNT ONE

THE GRAND JURY FURTHER CHARGES:

69.    The allegations contained in Paragraphs 1 through 68 are re-alleged and incorporated by reference as though fully set forth herein.

70.    From in or around January 2016 and continuing through in or around July 2021, in the Middle District of Tennessee and elsewhere, **[1] ALSHALABI**, **[2] KLAPP**, **[3] CHASTAIN**, **[4] ALLISON**, **[5] WHITE**, **[6] RICHARDSON**, **[7] BURCH**, and **[8] HARRIS** did willfully and knowingly combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, including marketing companies, telemedicine companies, and Co-Conspirator #1: to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare and Medicaid programs, and to commit certain offenses against the United States, that is:

      a.    knowingly and willfully offering and paying remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part a Federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A);

      b.    knowingly and willfully offering and paying remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, or item for which

13

payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B);

c.   knowingly and willfully soliciting and receiving remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A); and

d.   knowingly and willfully soliciting and receiving remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B).

**Purpose of the Conspiracy**

71.   It was the purpose of the conspiracy for **[1] ALSHALABI** and his co-conspirators, including **[2] KLAPP**, **[3] CHASTAIN**, **[4] ALLISON**, **[5] WHITE**, **[6] RICHARDSON**, **[7] BURCH**, **[8] HARRIS**, marketing companies, telemedicine companies, Co-Conspirator #1, and others, known and unknown to the Grand Jury, to unlawfully enrich themselves and others by, among other things:

14

a. offering, paying, soliciting, and receiving kickbacks and bribes in return for recruiting and referring Medicare and Medicaid beneficiaries for laboratory testing to Crestar Labs, including UA and genetic testing;

b. offering and paying kickbacks and bribes to marketers, including marketing companies, in return for marketers recruiting, recommending and referring Medicare and Medicaid beneficiaries for UA samples or to obtain genetic material for genetic testing kits and to sign medical documentation;

c. offering and paying kickbacks and bribes to telemedicine companies, to obtain doctors' orders for genetic testing for beneficiaries;

d. soliciting and receiving kickbacks and bribes from other laboratories;

e. soliciting and receiving kickbacks and bribes from individuals associated with telemedicine companies;

f. submitting and causing the submission of false and fraudulent claims to Medicare and Medicaid for laboratory tests;

g. concealing kickbacks and bribes;

h. concealing the submission of false and fraudulent claims to Medicare and Medicaid; and

i. diverting proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

**Manner and Means**

72. The manner and means by which **[1] ALSHALABI, [2] KLAPP, [3] CHASTAIN, [4] ALLISON, [5] WHITE, [6] RICHARDSON, [7] BURCH, [8] HARRIS,** and their co-

15

conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

73. It was part of the conspiracy that beginning in or around 2015, **[1] ALSHALABI** incorporated Omni Labs, Inc., in Charlotte, North Carolina, for the purported purpose of negotiating the purchase of laboratories and solicited money from potential investors to buy laboratories.

74. It was further part of the conspiracy that **[1] ALSHALABI** received money from investors for the purported purchase of laboratories.

75. It was further part of the conspiracy that **[1] ALSHALABI** transferred, or caused to be transferred, money for a purported stake in a laboratory controlled by Co-Conspirator #1 and located in Georgia.

76. It was further part of the conspiracy that **[1] ALSHALABI** purchased Crestar Labs, LLC and initially partnered with Co-Conspirator #1 on the ownership and operation of Crestar Labs, LLC.

77. It was further part of the conspiracy that **[1] ALSHALABI** formed Omni Holding Group, LLC, which **[1] ALSHALABI** represented owned the laboratories he purchased and whose members consisted of **[1] ALSHALABI** and investors. **[1] ALSHALABI** caused tax returns to be filed on behalf of Omni Holding Group, LLC, and **[1] ALSHALABI** communicated regularly with investors about Omni Holding Group, LLC's ongoing business, including the performance of the laboratories.

78. It was further part of the conspiracy that **[1] ALSHALABI** acquired a number of additional laboratories, including Karemore Labs, Martis Analytics and Diagnostics, LLC, and

Advanta Labs, in order to utilize different National Provider Identifier numbers to obtain Medicare and Medicaid payment for Crestar Labs' claims for genetic testing.

79.     It was further part of the conspiracy that Crestar Labs, through **[1] ALSHALABI**, was an enrolled and participating provider in Medicare. **[1] ALSHALABI** certified to Medicare that Crestar Labs would comply with all Medicare rules and regulations, and federal laws, including that he would refrain from violating the federal Anti-Kickback Statute, which prohibited the knowing and willful payment of kickbacks or bribes to induce or reward patient referrals involving any item or service payable by federal health care programs, and that Crestar Labs would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare. **[1] ALSHALABI** also caused Crestar Labs to enroll in Medicaid programs as a participating provider, and Crestar Labs, through the signatures of others, made similar certifications.

80.     Crestar Labs, through **[1] ALSHALABI**, **[2] KLAPP**, and co-conspirators contracted with various co-conspirator marketing companies, through the marketing company owners or principals (the "Marketing Companies"), to obtain UA and/or genetic testing samples from Medicare and Medicaid beneficiaries, including the following:

      a.      Genetix;

      b.      Freedom:

      c.      Secure Health;

      d.      Marketing Company #1 – a marketing company based in Florida that identified and solicited beneficiaries to receive genetic testing;

      e.      Marketing Company #2 – a marketing company based in Florida that identified and solicited beneficiaries to receive genetic testing;

f. Marketing Company #3 – a marketing company based in Georgia that operated under two different company names and identified and solicited beneficiaries to receive genetic testing;

g. Marketing Company #4 – a marketing company based in Colorado that identified and solicited beneficiaries to receive genetic testing;

h. Marketing Company #5 – a marketing company based in Florida that identified and solicited beneficiaries to receive genetic testing;

i. Marketing Company #6 – a marketing company based in Florida that identified and solicited beneficiaries to receive genetic testing; and

j. Marketing Company #7 – a marketing company based in Ohio that identified and solicited beneficiaries to receive genetic testing.

81. The Marketing Companies, through their co-conspirator owners and principals, entered into agreements with various co-conspirator companies and individuals who purported to provide telemedicine services (the "Telemedicine Companies") to pay for and obtain orders for genetic tests for Medicare and Medicaid beneficiaries to send to Crestar Labs, including the following:

a. Advanced Tele-Genetic Counseling ("ATGC") – a telemedicine company based in Kentucky that paid medical providers to sign orders for genetic testing;

b. Telemedicine Company #1 – a telemedicine company based in Florida that paid medical providers to sign orders for genetic testing;

c. Telemedicine Company #2 – a telemedicine company based in South Carolina that paid medical providers to sign orders for genetic testing; and

18

d. Telemedicine Company #3 – a telemedicine company based in Texas that paid medical providers to sign orders for genetic testing.

82. It was further part of the conspiracy that **[1] ALSHALABI,** on his own and through employees of Crestar Labs, including **[2] KLAPP** and **[5] WHITE**, paid kickbacks and bribes to **[3] CHASTAIN, [4] ALLISON, [6] RICHARDSON, [7] BURCH, [8] HARRIS**, the Marketing Companies, and others, in exchange for the recruitment and referral of Medicare and Medicaid beneficiaries that **[3] CHASTAIN, [4] ALLISON, [6] RICHARDSON, [7] BURCH, [8] HARRIS**, the Marketing Companies, and others referred to Crestar Labs for UA and/or genetic testing, without regard to the medical necessity of the tests.

83. It was further part of the conspiracy that **[3] CHASTAIN, [4] ALLISON, [6] RICHARDSON, [7] BURCH, [8] HARRIS**, the Marketing Companies, and others, solicited and received kickbacks, including from **[1] ALSHALABI, [2] KLAPP** and **[5] WHITE**, in exchange for recruiting and referring Medicare and Medicaid beneficiaries to Crestar Labs, knowing that Crestar Labs would bill Medicare and Medicaid for UA and/or genetic testing purportedly provided to the recruited beneficiaries, without regard to the medical necessity of the tests.

84. It was further part of the conspiracy that **[1] ALSHALABI**, on his own and through employees of Crestar Labs, including **[2] KLAPP**, entered into contracts or agreements with **[3] CHASTAIN, [4] ALLISON, [6] RICHARDSON, [7] BURCH, [8] HARRIS**, the Marketing Companies, and others, that disguised kickbacks and bribes as payments from the laboratories for marketing services.

85. It was further part of the conspiracy that **[3] CHASTAIN, [4] ALLISON, [6] RICHARDSON, [7] BURCH, [8] HARRIS**, and the Marketing Companies paid their field marketers or sales representatives to directly recruit Medicare and Medicaid beneficiaries to

19

provide samples of their genetic material to the marketer for genetic testing and to sign documentation provided by the marketer or sales representative.

86. It was further part of the conspiracy that **[3] CHASTAIN, [4] ALLISON, [6] RICHARDSON, [7] BURCH, [8] HARRIS**, and the Marketing Companies, on their own and through field marketers or sales representatives, recruited Medicare and Medicaid beneficiaries at senior fairs, nursing homes, low-income housing, beneficiary residences, and other locations, and induced them to accept genetic tests regardless of the fact that these tests were not routinely covered by Medicare or Medicaid and without regard to whether the tests were medically necessary.

87. It was further part of the conspiracy that **[3] CHASTAIN, [4] ALLISON, [6] RICHARDSON, [7] BURCH, [8] HARRIS**, and the Marketing Companies used the recruited Medicare and Medicaid beneficiary information to generate genetic testing orders by inputting the recruited Medicare and Medicaid beneficiary information into Crestar Labs' requisition order forms, or providing the information directly to the Telemedicine Companies.

88. It was further part of the conspiracy that **[3] CHASTAIN, [4] ALLISON, [6] RICHARDSON, [7] BURCH, [8] HARRIS**, and the Marketing Companies, obtained signed orders for genetic tests for the recruited Medicare and Medicaid beneficiaries by paying the Telemedicine Companies kickbacks and bribes for signed orders by doctors or other medical providers ("doctors' orders") that ordered the genetic testing for Medicare and Medicaid beneficiaries without regard to the medical necessity of the test and even though the medical providers were not the treating physician for the beneficiaries, were not treating the beneficiaries for cancer or symptoms of cancer, did not use the results in the treatment of the beneficiaries, did

not conduct a proper telemedicine visit, and often never communicated with the beneficiaries at all.

89.     It was further part of the conspiracy that on occasion, **[1] ALSHALABI, [2] KLAPP, [5] WHITE**, and others at Crestar Labs, obtained the doctors' orders, that were procured through the payment of kickbacks, directly from the Telemedicine Companies.

90.     It was further part of the conspiracy that **[5] WHITE** solicited and received kickbacks from a co-conspirator associated with Telemedicine Company #1 in exchange for referring Freedom to the co-conspirator, and for directly sending requisition order forms for genetic tests to the co-conspirator.

91.     It was further part of the conspiracy that **[1] ALSHALABI, [2] KLAPP, [5] WHITE**, and others at Crestar Labs used the genetic testing samples and medical documentation obtained from the beneficiaries by the Marketing Companies, as well as the doctors' orders, to submit or cause the submission of claims to Medicare and Medicaid for genetic tests.

92.     If was further part of the conspiracy that **[1] ALSHALABI, [2] KLAPP, [5] WHITE,** and their co-conspirators tracked the number of referrals sent by the Marketing Companies, the amount of the kickback payments to the Marketing Companies, and the Medicare or Medicaid reimbursement for each referral.

93.     It was further part of the conspiracy that **[1] ALSHALABI, [2] KLAPP, [5] WHITE**, and their co-conspirators accepted sham invoices from the Marketing Companies that made it appear as if the Marketing Companies provided hourly services by specific rate, as a means to conceal the true nature of the kickbacks and bribes.

94.     It was further part of the conspiracy that **[1] ALSHALABI, [2] KLAPP, [5] WHITE** and their co-conspirators accepted sham invoices from the Marketing Companies that

21

made it appear as if the Marketing Companies provided services via a flat fee, as a means to conceal the true nature of the kickbacks and bribes.

95. It was further part of the conspiracy that **[1] ALSHALABI** operated as a marketer and referred genetic testing samples to another laboratory that submitted claims to Medicare and/or Medicaid, and **[1] ALSHALABI** accepted, through Crestar Labs' bank accounts, at least $300,000 in kickbacks from that laboratory based on the percentage of reimbursement from Medicare and/or Medicaid;

96. It was further part of the conspiracy that in or around December 2020, **[1] ALSHALABI** transferred the ownership of Advanta Labs to the name of another individual, but continued to control the laboratory himself, in order to further conceal the fraud.

97. It was further part of the conspiracy that **[1] ALSHALABI**, **[2] KLAPP**, **[5] WHITE** and their co-conspirators submitted, or caused to be submitted, approximately $128 million in claims to Medicare and at least $30.6 million in claims to Medicaid programs, including through a billing company operated by **[5] WHITE**, for the UA and/or genetic tests obtained through kickbacks and bribes and without regard to whether the tests were medically necessary or eligible for reimbursement.

98. It was further part of the conspiracy that as a result of these claims, Medicare paid Crestar Labs at least approximately $34.4 million, and Medicaid programs, including Georgia, Colorado, South Carolina, Tennessee, and North Carolina paid at least approximately $3.2 million.

99. **[1] ALSHALABI**, **[2] KLAPP**, **[3] CHASTAIN**, **[4] ALLISON**, **[5] WHITE**, **[6] RICHARDSON**, **[7] BURCH**, **[8] HARRIS**, and other co-conspirators, used the fraud proceeds received from Crestar Labs to benefit themselves and others, and to further the fraud.

22

**Overt Acts**

100.    In furtherance of the conspiracy, and to accomplish its objects and purposes, at least one of the co-conspirators committed, or caused to be committed, in the Middle District of Tennessee and elsewhere, at least one of the following overt acts, among others:

A.    On or about January 12, 2016, and January 13, 2016, **[1] ALSHALABI** transferred, or caused to be transferred, approximately $2,740,000 from Omni Labs, Inc.'s Bank of America account to a company in the name of the son of Co-Conspirator #1 for a purported interest in a laboratory;

B.    On or about February 12, 2016, **[1] ALSHALABI** met in person with a number of investors in Charlotte, North Carolina, to discuss their investments in laboratories, including with Co-Conspirator #1, and to solicit additional investments for another laboratory in Tennessee;

C.    On or about February 22, 2016, **[1] ALSHALABI** closed on the purchase for Crestar Labs, LLC, located in Spring Hill, Tennessee;

D.    On or about October 13, 2017, **[1] ALSHALABI** emailed a group of investors in Crestar Labs and stated, "[t]he lab has already started receiving DNA samples from the group in Florida that is estimated to reach a thousand samples in the next 60 days. In March I was able to create and support this group with an office and training including financial needs and now this group is sending accounts every week with DNA samples";

E.    On or about December 29, 2017, **[1] ALSHALABI** was included on emails discussing a contract with Marketing Company #1 to pay 50% on UA toxicology per "Federal sample paid." It went on to note Crestar Labs may want to lower the percentage paid to the marketing company for genetic testing to 30-35% which will "still net them

23

about 6-700/sample at a federal reimbursement of $2500." A Crestar Labs employee responded to ask if they found out about "federal specimen payment to reps?" and an employee responded, "[i]t was why they were indicating we may want to W2 the representatives";

F.      On or about January 4, 2018, Crestar Labs and Marketing Company #1 entered into a Laboratory Services Agreement to, among other things, "bring[] more business and clients to [Crestar Labs]" and "bring[] reference business from other Laboratories to [Crestar Labs]." Crestar Labs and Marketing Company #1 agreed that Marketing Company #1 would "be paid a flat rate of $50.00 (fifty dollars) on all paid adjudicated specimen tested by [Crestar Labs]," as reflected in Exhibit B of the agreement;

G.      On or about February 23, 2018, a marketer emailed Crestar Labs, including **[1] ALSHALABI**, to state that he wanted to "get paid per paid cup whether it is a flat rate or percentage from the gross and not be worried about complex calculation as this is the only way for me to understand and be compensated." In response, Crestar Labs, including **[1] ALSHALABI**, sent him a marketing contract for "toxicology and genetics" for 20% of gross toxicology collections "per each urine specimen" based on "total reimbursement earned and collected by the Laboratory through CPT code billings from the applicable government healthcare program or insurance provider" and 20% of gross genetics collections "per each pharmacogenetic sample or isolated genomic DNA specimens" that was "referred to Laboratory by Sales Rep/Distributor" and "for which Laboratory has earned and collected payment . . . from the applicable government healthcare program or insurance provider";

24

H.    On or about May 16, 2018, Crestar Labs, through the signature of **[1] ALSHALABI**, and Marketing Company #1 executed an Amended Exhibit B, which stated that Marketing Company #1 would be paid "45% Less the Cost of Goods of the total reimbursement by third party commercial payer" and a percentage of all "Federal Specimen" less the cost of goods sold;

I.    On or about May 17, 2018, **[2] KLAPP** emailed the principals of Marketing Company #1 and **[1] ALSHALABI** and wrote, "I understand that the Agreement we signed yesterday is NON-COMPLIANT" and "the terms of the new Agreement will be an hourly based consulting Agreement";

J.    On or about May 24, 2018, Crestar Labs, through the signature of **[1] ALSHALABI**, and Marketing Company #1 executed an Amended Exhibit B, which stated that Marketing Company #1 would be paid "45% Less the Cost of Goods of the total reimbursement by third party commercial payer" and that Marketing Company #1 would "invoice [Crestar Labs] for any additional work that may be done";

K.    On or about June 27, 2018, a principal of Marketing Company #1 emailed **[1] ALSHALABI** to propose an increase to Marketing Company #1's "commission" rate from Crestar Labs from 30% to 45% and to reduce the per-sample Cost of Goods deduction. Marketing Company #1 further stated, "[f]irst thing that is paid is cost of goods to cover the labs cost for any work done. Then the revenue share to [Marketing Company #1] of what is left over is 45%";

L.    On or about September 12, 2018, **[1] ALSHALABI** emailed an employee of Crestar Labs requesting a calculations sheet for "commissions" for August. The sheet

indicated the amount owed to Marketing Company #1 based on the 45% of revenue was $11,779.05;

M.       On or about September 17, 2018, Marketing Company #1 emailed **[1] ALSHALABI** and an employee of Crestar Labs a sham hourly invoice for the same period of time in August and in the amount of $11,779 that purported to represent services by the hour at $250 per hour;

N.       On or about September 17, 2018, **[1] ALSHALABI** instructed the Technical Supervisor for Genetics at Crestar Labs ("Employee #1") and **[2] KLAPP** by email to move Crestar Labs from Telemedicine Company #2 to ATGC;

O.       On or about September 20, 2018, **[6] RICHARDSON**, on behalf of Freedom, executed an agreement with Telemedicine Company #1. The Fees section of the agreement stated that Freedom would compensate Telemedicine Company #1 $100 per telemedicine consultation;

P.       On or about October 4, 2018, **[1] ALSHALABI** told Employee #1 and **[2] KLAPP**, by email, to stop sending samples to a laboratory in South Carolina, "P.L." **[1] ALSHALABI** then forwarded the email to an executive of P.L. **[1] ALSHALABI** had previously agreed to refer genetic testing samples to P.L. in exchange for "commissions";

Q.       On or about October 5, 2018, P.L. paid $10,000 to Crestar Labs for "commissions" and confirmed the payment in an email to **[1] ALSHALABI**;

R.       In or around between October 2018 through July 2019, Co-Conspirator #1, through bank accounts associated with a laboratory controlled by him in Oklahoma, wired approximately $2.8 million to **[1] ALSHALABI**, through the Omni Labs, Inc. bank accounts;

S.    On or about November 28, 2018, Crestar Labs Employee #1 introduced Dr. S.A. to ATGC about "coming aboard";

T.    In or around November 2018, Crestar Labs, through the signature of **[2] KLAPP**, contracted with Genetix, through the signature of **[3] CHASTAIN**, to conduct marketing services through the use of independent contractor sales representatives;

U.    On or about December 3, 2018, Crestar Labs Employee #1 introduced **[3] CHASTAIN** and Genetix to ATGC and stated, "She is working with Crestar and wishes to utilize ATGC for her teleconsulting needs ...";

V.    On or about December 3, 2018, Crestar Labs, through the signature of **[2] KLAPP**, contracted with Freedom, through the signature of **[7] BURCH**, to conduct marketing services through the use of sales representatives "to promote, sell, recommend, and endorse [Crestar Labs'] Testing Services." Crestar Labs and Freedom agreed that Freedom would be paid according to a fee schedule for "paid specimens" only. The fee schedule provided that Freedom would be paid 45% of all paid toxicology, a type of UA, PGx, CGx, blood wellness, and carrier tests, less the tests' respective costs of goods;

W.    In or around January 2019, Freedom referred Georgia Medicaid beneficiary J.H. to Crestar for CGx testing:

   i.    The signed doctor order for the CGx test came from Telemedicine Company #1, with the signature of Dr. S.R.;

   ii.    In or around February 2019, **[1] ALSHALABI**, **[2] KLAPP**, and **[5] WHITE** caused Crestar to submit approximately $27,553 in claims to Georgia Medicaid for CGx testing purportedly rendered to Georgia Medicaid beneficiary J.H., of which Georgia Medicaid paid approximately $10,102;

27

iii.     In or around February, August, and September 2019, **[1] ALSHALABI** caused three payments totaling approximately $285,792 to be made to Freedom;

X.     On or about January 13, 2019, **[3] CHASTAIN** emailed ATGC regarding their contract negotiation and stated, "Any mention of referral needs to be taken out and some other terminology put in to protect us both";

Y.     On or about January 29, 2019, **[3] CHASTAIN**, on behalf of Genetix, and ATGC executed an agreement. In the Fees section of the agreement, the terms stated that Genetix would compensate ATGC "the price per referral." The payment schedule stated: "Fee per referral of $160";

Z.     On or about February 13, 2019, **[1] ALSHALABI** emailed P.L. and stated that P.L. owed Crestar Labs more than $300,000 in "commissions" on Colorado Medicaid claims billed by P.L. and stated that he planned to show up at P.L. the following day;

AA.     On or about February 14, 2019, **[2] KLAPP** responded to **[1] ALSHALABI**'s email to P.L. and stated to **[1] ALSHALABI**: "you must have really scared him";

BB.     On or about February 15, 2019, and continuing through February 22, 2019, P.L. paid approximately $266,000 to Crestar Labs for "commissions";

CC.     On or about February 20, 2019, a co-conspirator representative of Telemedicine Company #1 sent a text message to **[5] WHITE** stating, "Are those GA forms ready?";

DD.     On or about February 21, 2019, the co-conspirator representative of Telemedicine Company #1 sent a $1,000 payment to **[5] WHITE**;

28

EE.     On or about February 25, 2019, **[5] WHITE** sent the co-conspirator representative of Telemedicine Company #1 a text message with a link to a dropbox.com folder labeled "Crestar GA 2-23-19" and stated, "I have a couple hundred more to drop for you today";

FF.     In or around March 2019, Marketing Company #3 referred Medicare beneficiary J.K. to Crestar for CGx testing:

       i.     The signed doctor order for the CGx test came from a telemedicine company, with the signature of Dr. J.A.;

      ii.     In or around June 2019, **[1] ALSHALABI**, **[2] KLAPP**, and **[5] WHITE** caused Crestar to submit approximately $8,100 in claims to Medicare for CGx testing purportedly rendered to Medicare beneficiary J.K., of which Medicare paid approximately $3,423;

      iii.     In or around August 2019, **[1] ALSHALABI** caused a payment to be made in the amount of $70,000 to Marketing Company #3;

GG.     In or around March 2019, **[3] CHASTAIN** and **[4] ALLISON**, through their marketing company Genetix, referred Medicare beneficiary M.W. to Crestar for CGx testing:

      i.     The signed doctor order for the CGx test came from ATGC, with the signature of Dr. S.A.;

      ii.     In or around June 2019, **[1] ALSHALABI** caused Crestar to submit approximately $13,478 in total claims to Medicare for CGx testing purportedly rendered to Medicare beneficiary M.W., of which Medicare paid approximately $5,383;

iii.      In or around August 2019, **[1] ALSHALABI** caused a payment to be made in the amount of $70,000 to Genetix;

HH.      On or about April 2, 2019, Crestar Labs, through **[2] KLAPP**, terminated the relationship with Freedom, purportedly based on Freedom's marketing practices;

II.      On or about April 4, 2019, Crestar Labs, through the signature of **[2] KLAPP**, contracted with Secure Health, through the signature of **[8] HARRIS**, to conduct marketing services through the use of sales representatives "to promote, sell, recommend and endorse [Crestar Labs'] Testing Services." Crestar Labs and Secure Health agreed that Secure Health would be paid according to a fee schedule for "paid specimens" only. The fee schedule provided that Secure Health would be paid 30% of all paid toxicology, a type of UA, PGx, CGx, blood wellness, and carrier tests, less the tests' respective costs of goods;

JJ.      On or about April 11, 2019, **[8] HARRIS**, on behalf of Secure Health, executed an agreement with ATGC, for physician "consults." In the Fees section of the agreement, the terms stated that Secure Health would compensate ATGC "the price per referral." The payment schedule stated: "Fee per referral of $170";

KK.      On or about April 17, 2019, ATGC sent an invoice to **[3] CHASTAIN**. The invoice listed a quantity of 640 at a rate of $160 for a total amount owed of $102,400.00;

LL.      On or about April 18, 2019, **[3] CHASTAIN** emailed ATGC about the April 17th invoice and stated: "We still have 217 applications still waiting on Dr's signatures. Believe me I want to be able to pay you now but we can't simply because we still haven't been paid by the lab";

MM.    On or about April 18, 2019, Freedom sent $25,500 to a company belonging to a representative of Telemedicine Company #1 as payment for telemedicine consultations;

NN.    On or about April 21, 2019, **[2] KLAPP** sent a letter to **[8] HARRIS** informing **[8] HARRIS** that Crestar Labs was terminating its April 2, 2019 agreement with Secure Health and that Crestar Labs was replacing its existing agreement "to ensure compliance with various state and federal regulations and guidelines";

OO.    On or about April 26, 2019, **[6] RICHARDSON** sent an email to **[1] ALSHALABI**, **[2] KLAPP**, **[5] WHITE**, and **[7] BURCH** and stated, "We had several meetings and discussions about our marketing practices. Crestar knew everything we did. . . . Your group knew everything we did and gave guidance all along. You knew we paid people for survey's";

PP.    On or about May 13, 2019, **[2] KLAPP**, on behalf of Crestar Labs, and **[8] HARRIS**, on behalf of Secure Health, entered into a "Memorandum of Understanding" (MOU). The MOU stated Crestar Labs' intention to enter into a formal agreement with Secure Health "for marketing services involving lab testing for patients and other healthcare services." The MOU also stated that Secure Health would continue to send samples to Crestar Labs for the month of May 2019;

QQ.    On or about May 17, 2019, **[2] KLAPP** sent an email to **[3] CHASTAIN** regarding genetic testing samples sent by Genetix, copying **[1] ALSHALABI**, and stated "[w]e understand your frustration with not being able to get your samples processed and paid in a timely manner . . . we advanced you $50K last week against your current billed samples so you could pay some of your reps";

31

RR.    On or about May 17, 2019, **[3] CHASTAIN** sent an email to **[2] KLAPP**, **[5] WHITE** and others and asked **[2] KLAPP** to call ATGC to tell them to "keep processing our swabs until we get paid . . . they would get paid as soon as we did. I have already paid them for 29 consults for the money that we received from the lab for the 50,000." **[2] KLAPP** responded, "Money's coming honey";

SS.    On or about May 21, 2019, **[4] ALLISON** sent an email to **[1] ALSHALABI**, **[2] KLAPP**, and **[5] WHITE**, with **[3] CHASTAIN** copied, regarding the terms of a new contract, and stated that the "flat-fee payment" needed to be "more in line with our volumes" and Genetix had "only been paid $50K on over 1200 submitted samples";

TT.    On or about May 21, 2019, **[4] ALLISON** emailed **[1] ALSHALABI**, **[2] KLAPP**, and **[5] WHITE**, with **[3] CHASTAIN** copied, and complained about "not being paid on any of our samples" and stated, "we need to be paid fairly for our volumes – past and future";

UU.    In or around June 2019, **[6] RICHARDSON** and **[7] BURCH** changed the name of their marketing company and resumed marketing services to recruit Medicare and Medicaid beneficiaries and Crestar Labs, through **[1] ALSHALABI**, **[2] KLAPP**, and **[5] WHITE**, re-engaged Freedom under its new name;

VV.    On or about June 5, 2019, **[2] KLAPP** forwarded to **[6] RICHARDSON** and **[7] BURCH** an email from **[5] WHITE** with information about the samples Freedom had already submitted. The email stated:

- 1,722 Total Samples
- 1,013 Samples Unsatisfactory
- 709 Samples Billed
- 326 of those billed are paid

- $2,704,781.19 Collected.

On or about June 6, 2019, **[6] RICHARDSON** responded about 1,013 unsatisfactory samples and stated, "We paid for the reqs so we will need a list of the patients that still need them";

WW.    On or about June 14, 2019, **[5] WHITE** emailed **[1] ALSHALABI**, **[2] KLAPP**, and **[3] CHASTAIN** with an Excel file attached tracking the samples to date from Genetix.  The email stated:

- 116 Samples Paid to date
- $306,294.34 Collected
- 1,029 samples billed to date
- 913 samples pending at insurance.

Later that same day, **[5] WHITE** sent an updated Excel file with the patient names included for tracking the swabs.  The vast majority were listed as Medicare beneficiaries;

XX.    On or about June 14, 2019, **[2] KLAPP**, on behalf of Crestar Labs, and **[8] HARRIS**, on behalf of Secure Health, entered into a "Laboratory – Marketing Company Agreement" where Crestar Labs agreed to pay Secure Health "in the amount of $133,500";

YY.    On or about June 17, 2019, ATGC sent an invoice to **[8] HARRIS**. The invoice listed a quantity of 257 at a rate of $170 for a total amount owed of $43,690.00;

ZZ.    On or about June 25, 2019, **[2] KLAPP** sent an email to **[1] ALSHALABI** and **[5] WHITE**, stating:

Please share some good news today with regard to getting paid from Medicare…

I'm getting bombarded until 11pm last night from:

[Owner of Marketing Company #4]
Lisa Chastain
[Owner of Marketing Company #5]
[Principal of a Marketing Company]
[Owner of Marketing Company #2]

[Owner of Marketing Company #3]
[Owner of Marketing Company #6];

AAA.  On or about June 26, 2019, **[3] CHASTAIN** forwarded an email from one of Genetix's sales representatives to **[1] ALSHALABI**, **[2] KLAPP**, and **[5] WHITE** that stated, "[p]lease get the money in the bank or we are all going to be in trouble."  The forwarded email was from a sales representative stating that she was "owed for six swabs" and threatening to go to the Alabama Secretary of State if she was not paid;

BBB.  On or about June 30, 2019, **[2] KLAPP** emailed **[8] HARRIS** about a new marketing agreement and proposed "a FLAT FEE Agreement of $150K and you can invoice us for the marketing fees associtated [sic] with your output for any differences";

CCC.  In or around June 2019, Secure Health referred Medicare beneficiary C.O. to Crestar Labs for CGx testing:

    i.      The signed doctor order for the CGx test came from ATGC, with the signature of Dr. B.T.;

    ii.     In or around August 2019, **[1] ALSHALABI**, **[2] KLAPP**, and **[5] WHITE** caused Crestar to submit approximately $16,269.94 in claims to Medicare for CGx testing purportedly rendered to Medicare beneficiary C.O., of which Medicare paid approximately $3,423;

    iii.    In or around September and November 2019, **[1] ALSHALABI** caused two payments totaling approximately $354,627 to be made to Secure Health;

DDD.  On or about July 15, 2019, **[8] HARRIS** sent an email where he stated that "the contract we made that was signed by both parties on June 14th for $133,500 . . . was based on 89 successful tests being accessioned and good to go";

34

EEE.   On or about July 16, 2019, ATGC sent an invoice to **[8] HARRIS**. The invoice listed a quantity of 607 at a rate of $170 for a total amount owed of $103,190.00 for physician "consults";

FFF.   On or about July 17, 2019, **[8] HARRIS**, on behalf of Secure Health, wrote a check for $9,187.50 to an independent contractor working on behalf of Secure Health ("Secure Health IC #1") as payment for genetic testing samples Secure Health IC #1 collected;

GGG.   On or about July 18, 2019, Secure Health, through **[8] HARRIS**, paid ATGC $20,000 as payment toward the $43,690.00 invoice ATGC sent on June 17, 2019;

HHH.   On or about July 28, 2019, **[1] ALSHALABI**, **[2] KLAPP**, **[5] WHITE**, and others had an ongoing email exchange with Marketing Company #6 with the subject line from Marketing Company #6 as "Please Pay Us So We Can Put This To Rest." One part of the email chain states in part, from **[2] KLAPP**: "You will [b]e paid as we get paid on your samples. You do have access to your portal so you can see the status of your samples";

III.   On or about August 9, 2019, **[8] HARRIS** emailed Secure Health IC #1 an employment offer letter backdated to May 10, 2019, offering Secure Health IC #1 a "full time position . . . as a CGx consultant" with Secure Health at "a base pay rate of $4,000 per month" plus "potential bonuses based upon the total profit revenue generated for the company";

JJJ.   On or about August 10, 2019, Crestar Labs, through the signature of **[2] KLAPP**, contracted with Secure Health, through the signature of **[8] HARRIS**, to conduct marketing services through the use of sales representatives "to promote, sell, recommend

and endorse [Crestar Labs'] Testing Services." Crestar Labs and Secure Health agreed that Secure Health would be paid according to a fee schedule for "only PAID specimens." The fee schedule provided that Secure Health would be paid "35% of the gross revenue per month for all modalities" except on PGx tests, which was 35% of gross revenue minus $50 for a result review by a pharmacist;

KKK. On or about August 12, 2019, [1] ALSHALABI, [3] CHASTAIN, and [5] WHITE discussed their ongoing business and specifically discussed how doctors' orders for genetic testing were obtained. During that discussion, [3] CHASTAIN stated, in sum and substance, that ATGC was automatically approving doctors' orders for genetic tests without proper consideration, to which [5] WHITE said, "Shhh. . . . Don't say that";

LLL. On or about September 18, 2019, Marketing Company #5 sent an email to [2] KLAPP and [5] WHITE, copying a principal of Telemedicine Company #3 stating: "To confirm, [Marketing Company #5] is paying $50.00 up front per patient to [Telemedicine Company #3]. The balance of $75.00 will then be paid once the [sic] we receive reimbursement from said patient. [Telemedicine Company #3] will bill directly to Crestar and money from [Marketing Company #5]'s AP can be debited to satisfy invoice. . . . We plan on starting Asap in sending in a lot more swabs";

MMM. On or about October 7, 2019, [5] WHITE sent an email to [1] ALSHALABI and [2] KLAPP with the subject line referencing Secure Health and stated that a patient called and said the patient "submitted his sample via someone going Door to Door marketing services";

NNN. On or about October 7, 2019, Crestar Labs, through **[2] KLAPP**, terminated the relationship with Secure Health, purportedly based on Secure Health's marketing practices;

OOO. On or about October 9, 2019, **[8] HARRIS** sent a text message to **[2] KLAPP** stating, "Would you mind sending an email or something simple just stating that we are indeed still working together, just so that the letter termination is no longer valid?" **[2] KLAPP** responded "Sure";

PPP. On or about October 14, 2019, the principal of Marketing Company #2 sent an email to **[1] ALSHALABI** and **[2] KLAPP** noting that several of their tests, which were for Medicare beneficiaries, should have been paid to Crestar "many months ago." The email went on to state "Where is our money? Our contract is predicated on a % of the amount received. All we get is a 'form' from [**[5] WHITE**] showing what he states Crestar was paid and not an actual report from Medicare/Medicaid. We are entitled to full disclosure because our income is based on this report. . . . We believe Crestar has been paid on these and Crestar has our money. . . . I will contact CMS, Medicare, Novitas and the FBI . . . . We want our money and we want it now! We are through being the nice guys. We have Agents who are losing their homes and being evicted from their apartments because of this";

QQQ. On or about October 22, 2019, **[8] HARRIS** sent a text message to **[1] ALSHALABI**, stating, "Fadel just confirming payment will be submitted today or tomorrow? Will that be a wire or ach? Thanks in advance!" **[1] ALSHALABI** responded: "Payment will be sent tomorrow";

37

RRR. On or about November 6, 2019, **[8] HARRIS** emailed **[1] ALSHALABI**, **[5] WHITE**, and others requesting payment of $240,988.28, which was based on a 35% interest in Crestar Labs' collections on genetic tests from Secure Health samples;

SSS. On or about December 17, 2019, **[1] ALSHALABI** purchased Advanta Labs in Richardson, Texas;

TTT. On or about February 5, 2020, **[8] HARRIS** emailed **[1] ALSHALABI** and **[5] WHITE** "to take steps to collecting the 66k payment" owed to Secure Health based on "a mutual understanding established that we would get paid on any further claims found to have been collected on." **[8] HARRIS** attached a spreadsheet of paid claims showing a total amount due of $66,381.17, which was calculated by taking 35% of the amount collected by Crestar Labs;

UUU. On or about February 12, 2020, **[8] HARRIS** emailed **[1] ALSHALABI** and others "to come to a mutual understanding of how we can move forward." In the email, **[8] HARRIS** proposed that one option for moving forward was to "operate based under our current agreement, which would mean we are owed $66,000";

VVV. In or around December 2020, **[1] ALSHALABI** transferred ownership of Advanta Labs to another individual but maintained control over the laboratory and continued to direct Crestar Labs employees in Spring Hill, Tennessee to operate the laboratory;

WWW. In or around January 2021, **[4] ALLISON**, on behalf of Genetix, emailed employees of Advanta Labs and stated, "Fadel has executed our Marketing Agreement and we are invoicing Advanta Labs for the first monthly payment so that we can send submissions to you";

XXX. In or around May 2021, **[1] ALSHALABI** was forwarded an email by a new "owner" of Advanta Labs that included a document tracking Medicare payments to Advanta Labs;

YYY. On or about the date below, in the Middle District of Tennessee, and constituting a separate overt act, **[1] ALSHALABI** and **[2] KLAPP** directly or indirectly made a payment to the Marketing Company as described below, in exchange for the referral of Medicare and Medicaid beneficiaries for genetic testing:

| On or About Date of Payment | Crestar Labs Bank Account | Amount | Recipient |
|---|---|---|---|
| 5/16/2018 | Suntrust x6074 | $31,670.16 | Marketing Company #1 |

and

ZZZ. On or about the dates below, in the Middle District of Tennessee, and each constituting a separate overt act, **[1] ALSHALABI**, **[2] KLAPP**, and **[5] WHITE** directly or indirectly made payments to the Marketing Companies as described below, in exchange for the referral of Medicare and Medicaid beneficiaries for genetic testing:

| On or About Date of Payment | Crestar Labs Bank Account | Amount | Recipient |
|---|---|---|---|
| 2/26/2019 | Suntrust x6074 | $85,792.33 | Freedom |
| 5/08/2019 | Suntrust x6074 | 10,000.00 | Genetix |
| 5/08/2019 | Suntrust x6074 | 10,000.00 | Genetix |
| 5/09/2019 | Suntrust x6074 | 30,000.00 | Genetix |
| 7/11/2019 | Suntrust x6074 | $7,500.00 | Marketing Company #2 |
| 8/05/2019 | JPMorgan Chase x0839 | $70,000.00 | Marketing Company #3 |
| 8/16/2019 | Suntrust x6074 | $25,000.00 | Marketing Company #4 |

| On or About Date of Payment | Crestar Labs Bank Account | Amount | Recipient |
|---|---|---|---|
| 8/16/2019 | Suntrust x6074 | $17,663.82 | Marketing Company #5 |
| 8/19/2019 | Suntrust x6074 | $4,103.58 | Marketing Company #6 |
| 8/29/2019 | Suntrust x6074 | $10,000.00 | Freedom |
| 8/30/2019 | JPMorgan Chase x0839 | $70,000.00 | Genetix |
| 9/6/2019 | Suntrust x6074 | $113,639.24 | Secure Health |
| 9/13/2019 | Suntrust x6074 | $190,000.00 | Freedom |
| 10/25/2019 | Suntrust x6074 | $4,011.90 | Marketing Company #7 |
| 11/14/2019 | Suntrust x6074 | $240,988.28 | Secure Health |

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH SEVENTEEN

THE GRAND JURY FURTHER CHARGES:

101.    The allegations contained in Paragraphs 1 through 100 are re-alleged and incorporated by reference as though fully set forth herein.

102.    On or about each date listed below, in the Middle District of Tennessee and elsewhere, the defendants listed below knowingly and willfully offered and paid any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid, each instance forming a separate count as outlined in the below table:

40

| Count | Defendants | On or About Date of Payment | Crestar Labs Bank Account | Amount | Recipient |
|---|---|---|---|---|---|
| 2 | [1] ALSHALABI, [2] KLAPP | 5/16/2018 | Suntrust x6074 | $31,670.16 | Marketing Company #1 |
| 3 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | 2/26/2019 | Suntrust x6074 | $85,792.33 | Freedom |
| 4 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | 5/08/2019 | Suntrust x6074 | 10,000.00 | Genetix |
| 5 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | 5/08/2019 | Suntrust x6074 | 10,000.00 | Genetix |
| 6 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | 5/09/2019 | Suntrust x6074 | 30,000.00 | Genetix |
| 7 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | 7/11/2019 | Suntrust x6074 | $7,500.00 | Marketing Company #2 |
| 8 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | 8/05/2019 | JPMorgan Chase x0839 | $70,000.00 | Marketing Company #3 |
| 9 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | 8/16/2019 | Suntrust x6074 | $25,000.00 | Marketing Company #4 |
| 10 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | 8/16/2019 | Suntrust x6074 | $17,663.82 | Marketing Company #5 |
| 11 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | 8/19/2019 | Suntrust x6074 | $4,103.58 | Marketing Company #6 |
| 12 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | 8/29/2019 | Suntrust x6074 | $10,000.00 | Freedom |

| Count | Defendants | On or About Date of Payment | Crestar Labs Bank Account | Amount | Recipient |
|---|---|---|---|---|---|
| 13 | **[1] ALSHALABI, [2] KLAPP, [5] WHITE** | 8/30/2019 | JPMorgan Chase x0839 | $70,000.00 | Genetix |
| 14 | **[1] ALSHALABI, [2] KLAPP, [5] WHITE** | 9/6/2019 | Suntrust x6074 | $113,639.24 | Secure Health |
| 15 | **[1] ALSHALABI, [2] KLAPP, [5] WHITE** | 9/13/2019 | Suntrust x6074 | $190,000.00 | Freedom |
| 16 | **[1] ALSHALABI, [2] KLAPP, [5] WHITE** | 10/25/2019 | Suntrust x6074 | $4,011.90 | Marketing Company #7 |
| 17 | **[1] ALSHALABI, [2] KLAPP, [5] WHITE** | 11/14/2019 | Suntrust x6074 | $240,988.28 | Secure Health |

Each in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), and Title 18, United States Code, Section 2.

## COUNTS EIGHTEEN THROUGH TWENTY-SIX

THE GRAND JURY FURTHER CHARGES:

103. The allegations contained in Paragraphs 1 through 100 are re-alleged and incorporated by reference as though fully set forth herein.

104. On or about each date listed below, in the Middle District of Tennessee and elsewhere, the defendants listed below knowingly and willfully solicited and received any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under a

42

Federal health care program, that is, Medicare and Medicaid, each instance forming a separate count as outlined in the below table:

| Count | Defendants | On or About Date Payment Received | Crestar Labs Sender Bank Account | Amount | Recipient Bank Account |
|-------|-----------|-----------------------------------|----------------------------------|--------|------------------------|
| 18 | **[6] RICHARDSON, [7] BURCH** | 2/26/2019 | Suntrust x6074 | $85,792.33 | Capital One x8307 |
| 19 | **[3] CHASTAIN, [4] ALLISON** | 5/08/2019 | Suntrust x6074 | 10,000.00 | Suntrust x2147 |
| 20 | **[3] CHASTAIN, [4] ALLISON** | 5/08/2019 | Suntrust x6074 | 10,000.00 | Suntrust x2147 |
| 21 | **[3] CHASTAIN, [4] ALLISON** | 5/13/2019 | Suntrust x6074 | 30,000.00 | Suntrust x2147 |
| 22 | **[6] RICHARDSON, [7] BURCH** | 8/29/2019 | Suntrust x6074 | $10,000.00 | Capital One x1720 |
| 23 | **[3] CHASTAIN, [4] ALLISON** | 8/30/2019 | JPMorgan Chase x0839 | $70,000.00 | Suntrust x2147 |
| 24 | **[8] HARRIS** | 9/6/2019 | Suntrust x6074 | $113,639.24 | Utah Community Credit Union x5025 |
| 25 | **[6] RICHARDSON, [7] BURCH** | 9/13/2019 | Suntrust x6074 | $190,000.00 | Capital One x1720 |
| 26 | **[8] HARRIS** | 11/14/2019 | Suntrust x6074 | $240,988.28 | Utah Community Credit Union x5025 |

Each in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A), and Title 18, United States Code, Section 2.

43

## COUNT TWENTY-SEVEN

THE GRAND JURY FURTHER CHARGES:

105.    The allegations contained in Paragraphs 1 through 100 are re-alleged and incorporated by reference as though fully set forth herein.

106.    From in or around January 2016 and continuing through in or around July 2021, in the Middle District of Tennessee and elsewhere, **[1] ALSHALABI**, **[2] KLAPP**, **[3] CHASTAIN**, **[4] ALLISON**, **[5] WHITE**, **[6] RICHARDSON**, **[7] BURCH**, and **[8] HARRIS** did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

107.    It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things:

    a.    paying and receiving kickbacks in exchange for the referral of Medicare and Medicaid beneficiaries, so that Crestar Labs could bill Medicare and Medicaid for genetic tests, without regard to whether the beneficiaries needed the test;

    b.    paying or causing the payment of kickbacks to telemedicine companies in exchange for the ordering and arranging for the ordering of genetic tests for Medicare and

44

Medicaid beneficiaries, without regard to the medical necessity for the prescribed genetic tests;

  c. submitting and causing the submission of false and fraudulent claims to Medicare and Medicaid through Crestar Labs and other laboratories for genetic tests that were not medically necessary and not eligible for reimbursement;

  d. concealing the submission of false and fraudulent claims to Medicare and Medicaid; and

  e. diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

108. The Manner and Means section of Count One of this Second Superseding Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of how the co-conspirators sought to accomplish the purpose of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWENTY-EIGHT THROUGH THIRTY-EIGHT

THE GRAND JURY FURTHER CHARGES:

109. The allegations contained in Paragraphs 1 through 100 and 106 through 108 are re-alleged and incorporated by reference as though fully set forth herein.

110. On or about each date listed below, in the Middle District of Tennessee and elsewhere, the defendants listed below, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under

45

the custody and control of, said healthcare benefit programs, by submitting or causing to be submitted, to Medicare and Medicaid, false and fraudulent claims for genetic testing, representing that the services were medically necessary, eligible for reimbursement, and provided to Medicare beneficiaries as claimed, with each claim forming a separate count as outlined in the table below:

| Count | Defendants | Medicare / Medicaid Beneficiary | Ordering Provider | Claim On or About Date | Claim Control Number | Approx. Amt. Billed to Medicare / Medicaid |
|---|---|---|---|---|---|---|
| 28 | [1] ALSHALABI, [2] KLAPP, [5] WHITE, [6] RICHARDSON, [7] BURCH | T.J. | S.R. | 2/12/2019 | 2019043034321 | $27,553.20 |
| 29 | [1] ALSHALABI, [2] KLAPP, [5] WHITE, [6] RICHARDSON, [7] BURCH | J.H. | S.R. | 2/12/2019 | 2019043034270 | $27,553.20 |
| 30 | [1] ALSHALABI, [2] KLAPP, [5] WHITE, [6] RICHARDSON, [7] BURCH | K.W. | S.R. | 4/30/2019 | 2019120055057 | $27,553.20 |
| 31 | [1] ALSHALABI, [2] KLAPP, [3] CHASTAIN, [4] ALLISON, [5] WHITE | M.W. | S.A. | 6/17/2019 | 691019168745470 | $11,845.10 |
| 32 | [1] ALSHALABI, [2] KLAPP, [3] CHASTAIN, [4] ALLISON, [5] WHITE | B.K. | A.R. | 6/18/2019 | 691019169559920 | $6,974.04 |
| 33 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | E.J. | D.G. | 6/26/2019 | 699619177600032 | $8,105.95 |

| Count | Defendants | Medicare / Medicaid Beneficiary | Ordering Provider | Claim On or About Date | Claim Control Number | Approx. Amt. Billed to Medicare / Medicaid |
|---|---|---|---|---|---|---|
| 34 | [1] ALSHALABI, [2] KLAPP, [5] WHITE | J.K. | J.A. | 6/26/2019 | 699619177600085 | $8,105.95 |
| 35 | [1] ALSHALABI, [2] KLAPP, [3] CHASTAIN, [4] ALLISON, [5] WHITE | R.S. | C.M. | 8/7/2019 | 452919219276090 | $16,269.94 |
| 36 | [1] ALSHALABI, [2] KLAPP, [5] WHITE [8] HARRIS | C.O. | B.T. | 8/16/2019 | 452219228212570 | $16,269.94 |
| 37 | [1] ALSHALABI, [2] KLAPP, [5] WHITE [8] HARRIS | E.H. | B.T. | 8/21/2019 | 452919233109460 | $16,269.94 |
| 38 | [1] ALSHALABI, [2] KLAPP, [3] CHASTAIN, [4] ALLISON, [5] WHITE | S.S. | C.M. | 8/23/2019 | 160219235345260 | $1,681.18 |

Each in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS THIRTY-NINE AND FORTY

THE GRAND JURY FURTHER CHARGES:

111.     The allegations contained in Paragraphs 1 through 100 and 106 through 108 are re-alleged and incorporated by reference as though fully set forth herein.

112.     On or about each date listed below, in the Middle District of Tennessee and elsewhere, [1] **ALSHALABI** did knowingly engage and attempt to engage in the following monetary transactions by, through, and to a financial institution, and affecting interstate commerce,

47

in criminally derived property of a value greater than $10,000, that is, the deposit and transfer of

funds by Automatic Clearing House (ACH) and wire transfer from a Suntrust Bank account with

an account number ending in 6074, to the accounts listed below, in the amounts listed below, such

funds having been derived from specified unlawful activity, that is, conspiracy to commit health

care fraud, in violation of Title 18, United States Code, Section 1349, health care fraud, in violation

of Title 18, United States Code, Section 1347, conspiracy to defraud the United States through

health care kickbacks, in violation of Title 18, United States Code, Section 371, and the Anti-

Kickback Statue, in violation of Title 42, United States Code, Section 1320a-7b(b), with each

transaction forming a separate count as outlined in the table below:

| Count | On or About Date of Monetary Transaction | Description of Monetary Transaction |
|-------|------------------------------------------|-------------------------------------|
| 39 | 9/5/2019 | ACH Transfer of approximately $101,549.02 to a Wells Fargo Bank account belonging to Marketing Company #4 and ending in 3776. |
| 40 | 9/24/2019 | Wire Transfer of approximately $600,000.00 to a Suntrust Bank account belonging to Genetix and ending in 2147. |

Each in violation of Title 18, United States Code, Sections 1957 and 2.

### FORFEITURE ALLEGATION

113. The allegations of this Second Superseding Indictment are re-alleged and

incorporated by reference as though fully set forth herein for purposes of alleging forfeiture to the

United States of certain property in which the defendant has an interest.

114. Upon conviction of any of Counts One through Seventeen and Counts Twenty-

Eight through Thirty-Eight as to **[1] ALSHALABI** and **[2] KLAPP**, Count One, Nineteen,

Twenty, Twenty-One, Twenty-Three, Thirty-One, Thirty-Two, Thirty-Five, and Thirty-Eight as

to **[3] CHASTAIN** and **[4] ALLISON**, Counts One, Three though Seventeen, and Twenty-Eight

through Thirty-Eight as to **[5] WHITE**, Counts One, Eighteen, Twenty-Two, Twenty-Five,

48

Twenty-Eight, Twenty-Nine, and Thirty as to **[6] RICHARDSON** and **[7] BURCH**, and Counts One, Twenty-Four, Twenty-Six, Thirty-Six, and Thirty-Seven as to **[8] HARRIS** of the Second Superseding Indictment, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7). The property subject to forfeiture includes, but is not limited to, money judgments representing the value of the gross proceeds traceable to any offense of conviction.

115.    Upon conviction of Count Twenty-Seven of the Second Superseding Indictment, **[1] ALSHALABI**, **[2] KLAPP**, **[3] CHASTAIN**, **[4] ALLISON**, **[5] WHITE**, **[6] RICHARDSON**, **[7] BURCH**, and **[8] HARRIS** shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, pursuant to Title 18, United States Code, Section 981(a)(1)(c) by Title 28, United States Code, Section 2461(c). The property subject to forfeiture includes, but is not limited to, a money judgment representing the value of the gross proceeds traceable to any offense of conviction.

116.    Upon conviction of Count Thirty-Nine or Forty of the Second Superseding Indictment, **[1] ALSHALABI** shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property involved in such offense, pursuant to Title 18, United States Code, Section 982(a)(1). The property to be forfeited, includes but is not limited to, money judgments representing the value of any property, real or personal, involved in or otherwise traceable to property involved in any offense of conviction.

117.    If any of the above-described forfeitable property, as a result of any act or omission of **[1] ALSHALABI**, **[2] KLAPP**, **[3] CHASTAIN**, **[4] ALLISON**, **[5] WHITE**, **[6] RICHARDSON**, **[7] BURCH**, and/or **[8] HARRIS**:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, and it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of **[1] ALSHALABI, [2] KLAPP, [3] CHASTAIN, [4] ALLISON, [5] WHITE, [6] RICHARDSON, [7] BURCH**, and/or **[8] HARRIS**.

A TRUE BILL

███████████████████

FOREPERSON

MARK H. WILDASIN
UNITED STATES ATTORNEY

SARAH K. BOGNI
ROBERT S. LEVINE
ASSISTANT UNITED STATES ATTORNEYS

50