UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:21-CR-00171-1 |
| ) | |
| [1] FADEL Y. ALSHALABI, ) | Judge Richardson |
| ) | |
| Defendant. ) | |

**MOTION FOR AN ORDER OF FORFEITURE CONSISTING
OF UNITED STATES CURRENCY MONEY JUDGMENT**

The United States of America, pursuant to 18 U.S.C. § 982(a)(7) and § 982(a)(1) and the procedures set forth in Rule 32.2 of the Federal Rules of Criminal Procedure, by and through the undersigned Assistant United States Attorneys, hereby moves for the entry of an Order of Forfeiture consisting of a United States Currency Money Judgment against Fadel Alshalabi. The evidence presented at trial showed that Defendant obtained criminal proceeds through a lengthy fraud scheme that caused Medicare and Medicare to pay his companies and others for genetic test orders obtained by paying and receiving kickbacks.

I. **Background**

Defendant was convicted by a jury of the following crimes charged in the Second Superseding Indictment: Count One (conspiracy to accept and pay kickbacks and bribes in connection with a federal health care program, 18 U.S.C. § 371), Counts Eight through Seventeen (offering and paying kickbacks and bribes in connection with a federal health care program, 42 U.S.C. §§ 1320a-7b(b)(2)(A)), and Counts Thirty-Nine and Forty (money laundering, 18 U.S.C. § 1957). (D.E. 490, Redacted Verdict Form).

As described in detail below, the United States submits that Defendant is liable for a forfeiture money judgment of $35,609,979.20. The United States will seek substitute property if proceeds directly traceable to Defendant's fraud scheme cannot not be located. (D.E. 146, Second Superseding Indictment, PageID#: 998-99).

Sentencing is scheduled for June 25, 2025 at 9:00 a.m. (D.E. 598, Order).

**II.     Legal Framework**

Criminal forfeiture is a part of the sentence. *Libretti v. United States*, 516 U.S.C. § 29, 39 (1995). The United States is seeking forfeiture of all gross proceeds Defendant derived from the kickback scheme, property involved in money laundering, and property traceable to his kickback and money laundering crimes.

Title 18, United States Code, Section 982(a)(7) governs criminal forfeiture in health care offense cases. Specifically, the provision states: "The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense" (emphasis added). A conspiracy to violate the Anti-Kickback Statute qualifies as a "Federal health care offense." *See* 18 U.S.C. § 24(a)(1); 42 U.S.C. § 1320a-7b(f).

In health care fraud cases, the insurance reimbursements a defendant receives because of unlawful and fraudulent acts constitute proceeds traceable to the commission of the offense under 18 U.S.C. § 982(a)(7). *United States v. Shah*, 95 F.4th 328, 381 (5th Cir. 2024) (proceeds in Anti-Kickback Statute case included private and government health insurance reimbursements); *United States v. Luna*, 968 F.3d 922, 931 (8th Cir. 2020) (gross proceeds encompassed the reimbursement amount received for all patients); *United States v. Young*, 108 F.4th 1307, 1327-28 (11th Cir. 2024), citing *United States v. Bradley*, 969 F.3d 585, 588-89 (6th Cir. 2020) ("Bradley II")

("proceeds" includes all money obtained but for the criminal act, even if that money is later distributed to coconspirators).

The Sixth Circuit includes as "proceeds" the total amount of money brought in through the fraudulent activity, including reimbursement of health insurance claims, with no costs deducted or setoffs applied. *See United States v. Jankowski*, No. 23-1404, 2024 WL 4554690, at *7 (6th Cir. Oct. 23, 2024) (affirming $35 million forfeiture under 18 U.S.C. § 982(a)(7) where $35 million in gross proceeds received); *United States v. Warshak*, 631 F.3d 266, 329-32 (6th Cir. 2010) (all proceeds linked to illegal conspiracy are subject to forfeiture where business is "pervaded by fraud"). Additionally, the gross proceeds of the entire scheme are forfeitable and is not limited to only the charged counts of conviction. *United States v. Betro*, No. 17-cr-20465, 2022 WL 2440757, at *4 (E.D. Mich. July 5, 2022), citing *United States v. Jafari*, 85 F. Supp. 3d 679, 687 (W.D. New York Jan. 16, 2015). Likewise, a defendant convicted of a health care fraud conspiracy must forfeit the proceeds of the entire conspiracy. *Betro*, at *3, citing *United States v. Hasson*, 333 F.3d 1264, 1279 (11th Cir. 2003).

*Honeycutt* generally requires a defendant to forfeit only the proceeds that he personally obtained because of his crime. *Honeycutt v. United States*, 137 S. Ct. 1626, 1632-33 (2017). A person "obtains" the proceeds of a crime, or property derived from the crime, when he has "personal possession" of the property because of his "own effort". *Id*. at 1632. A person who does not have an ownership interest in the proceeds and who does not "personally benefit" from the proceeds has not "obtained" the proceeds. *Id*. at 1635. However, it does not matter how a defendant chooses to spend the proceeds once he or she obtains the proceeds. Additionally, leaders of organizations are subject to forfeiture liability for *any* tainted property handled by those below them in the conspiracy. *Id*. at 1633. The "mastermind might receive payments directly from drug

3

purchasers, or he might arrange to have drug purchasers pay an intermediary such as the college student. In all instances, he ultimately 'obtains' the property—whether directly or indirectly." *Id*. Absent proof that the conspiracy leader did not have direct or indirect control over the proceeds, the leader should forfeit all proceeds obtained by the conspiracy.

### III. Forfeiture Money Judgment

The facts presented at trial established that Defendant's fraud scheme involved the payment and receipt of kickbacks, so that Medicare and Medicaid would reimburse Defendant's companies and other entities for genetic testing services. "But for" the kickbacks Defendant paid to marketers, telemedicine companies, and other entities, the reimbursement claims submitted by Crestar Labs, Advanta Labs, and other entities would not have been paid. Because Defendant was the mastermind of the kickback conspiracy, controlled the bank accounts into which reimbursement payments were deposited, and dictated the terms and payments of the kickbacks, he "obtained", directly and indirectly, the gross proceeds and property traceable to his crimes.

#### A. **Federal Health Insurance Gross Proceeds Are Forfeitable**

A defendant convicted of a federal health care offense must forfeit the gross proceeds of the scheme. *Jankowski*, at *7. Here, the jury found that Defendant led a kickback scheme to obtain referrals of Medicare and Medicaid beneficiaries. Defendant owned and operated multiple medical laboratory companies, including the three Crestar Labs locations. and Advanta Labs, LLC. (PSR ¶¶ 50, 54-55). He applied on behalf of his companies and was accepted to be a participating provider. (PSR ¶ 57). To become a participating provider, Defendant promised that he would not accept or pay kickbacks for patient referrals. (PSR ¶¶ 27-28, 57). This certification is required to ensure that the services provided are reasonable, necessary and beneficial to recipients. Without

these attestations, Defendant would have been prohibited from billing or receiving payments from health insurance programs for his services. (PSR ¶ 37).

Beginning in 2016, Defendant agreed to pay marketing companies for referrals to conduct genetic testing for health insurance beneficiaries. (PSR ¶¶ 59-62). Defendant, through his companies, subsequently billed Medicare and Medicaid for genetic testing. He returned a portion of the money to the marketing and telemedicine companies with whom he colluded. Defendant and his coconspirators used terms such as 'consulting' fees, 'commissions', and created false invoices to disguise the true nature of the kickback payments. (PSR ¶¶ 62, 69(n)). Virtually all the claims submitted by Crestar and Advanta were test orders obtained from the kickback conspiracy. The kickback conspiracy infected virtually every aspect of Defendant's companies.

The PSR currently calculates that Defendant, through his companies, received Medicare and Medicaid payments totaling $35,609,979.20. (PSR ¶ 72). During the period of the conspiracy, Crestar Labs billed approximately $105,138,131.96 to Medicare. Medicare paid Crestar Labs approximately $19,143,063.49. The Medicare payments were deposited into Crestar bank accounts controlled by Defendant, including JPM *1222, PNC *5236, and REP *6686. Advanta Labs billed Medicare $24,598,356.58 during the conspiracy period. Medicare paid Advanta Labs $16,466,915.71, most of which was deposited into SUN *1632, an account controlled by Defendant. Had the insurance programs known that Defendant paid kickbacks in exchange for the test services (and caused others to pay and accept kickbacks), Medicare and Medicaid would have denied payment of the claims, even if the services were rendered. (PSR ¶¶ 27, 28, 35, 37); *United States v. Moss*, 34 F.4th 1176, 1194-1195 (11th Cir. 2022) (where Medicare pays zero dollars to a provider submitting a false claim, the entire amount is forfeitable even if the service is provided, because but for the fraud, the defendant would not have been able to bill for the service).

Given the extensive nature of the kickback scheme, there should be no doubt that Crestar and Advanta would not have existed "but for" Defendant's criminal conduct. As a result, the court should order Defendant to forfeit the gross proceeds his companies collected from Medicare and Medicaid. *See Warshak*, 631 F.3d at 329-30 (6th Cir. 2010) (all proceeds of defendant's business are forfeitable because the business was "permeated with fraud); *see also, United States v. Smith*, 749 F.3d 465, 488-89 (6th Cir. 2014) (citing *Warshak*; all revenue forfeitable as proceeds if the revenue stream would not have existed without the fraud).

Holding Defendant personally liable for all gross proceeds obtained through the conspiracy is consistent with forfeiture caselaw in the Sixth Circuit and elsewhere. A defendant in *United States v. Luna* was held responsible under to § 982(a)(7) for all fraud proceeds received in a car accident kickback scheme. 968 F.3d 922, 930-31 (8th Cir. 2020). In the Sixth Circuit, defendant Jankowski was a physician who owned a medical clinic, a pharmacy and a home-health facility. *Jankowski*, at *1. Medicare paid approximately $35 million to his companies for unnecessary medicine and upcoded services. *Id*. The Sixth Circuit affirmed the health care fraud forfeiture order of $35.3 million, pursuant to § 982(a)(7). *Id*., at *7. The *Jankowski* court noted that the $35.3 million figure represented the gross proceeds of the defendant's businesses. *Id*. Further, the health care fraud scheme touched every aspect of his companies, including business expenses and "payouts to coconspirators to carry out the scheme." *Id*. In short, all the businesses' revenue was forfeitable because those entities were implements of fraud. *Id*., at *8.

Defendant's situation is akin to *Jankowski*. The sole functions of Crestar and Advanta were to carry out Defendant's conspiracy, for his benefit and the benefit of others. Defendant decided who would receive kickbacks and the amounts. (PSR ¶¶ 68(a),(f); 69(l)). Trial testimony established that he paid marketers. (PSR ¶ 69(h)). Defendant had signatory authority on the bank

6

accounts into which the Medicare and Medicaid reimbursements were deposited. His companies profited from the kickback conspiracy. Defendant was the sole owner of the laboratories, through Stars Holding, LLC, which he set up as its sole member. Defendant repeatedly signed paperwork with Medicare and Medicaid as the "owner." Defendant had complete dominion and control of the laboratories, and as witnesses testified at trial, every decision was ultimately his to make. His conduct allowed other companies and individuals to profit, at the expense of Medicare and Medicaid. These facts show that Defendant "obtained" the gross proceeds of the conspiracy.

A forfeiture money judgment of $35,609,979.20 is appropriate.

### B. **Kickbacks Paid by Defendant are Forfeitable**

Alternatively, the kickbacks Defendant's companies paid could be characterized as direct proceeds or indirect proceeds traceable to the conspiracy. *United States v. Young* illustrates this point. The defendant in *Young* was convicted of conspiring to pay kickbacks, in violation of the Anti-Kickback Statute. 108 F.4th at 1315. A pharmacy network paid Young a monthly "fee" for Young's marketing and customer referral services. *Id*. at 1315. Young sent a portion of her "fee" to other coconspirators. *Id*. The kickbacks paid to Young were "gross proceeds" of the conspiracy. *Id*. at 1315. Young's claim that her forfeiture liability should be reduced by the amount she paid to the other coconspirators was rejected. *Id*. at 1325. The court declined to apply *Honeycutt* to Young because she was a leader of the conspiracy. *Id*. at 1326 (those "who both acquire[d] and use[d] the tainted property to pay coconspirators" are responsible for all proceeds). The kickbacks paid to Young were direct proceeds of Young's crime. *Id*. The money Young sent to the other coconspirators were indirect proceeds traceable to Young's crime. *Id*. at 1328.

The kickbacks Crestar and Advanta paid to coconspirators may be forfeited as indirect proceeds traceable to Defendant's crimes. He paid kickbacks to dozens of marketing companies:

7

- $4,685,941.55 paid by Alshalabi through Crestar to dozens of marketing companies (DE #633-6);
- $749,760.00 paid by Alshalabi through Advanta to Curis Management (owned by marketer Bebot Bona) (Trial Exhibit 702); and
- $6,595,356.00 paid by Alshalabi through Advanta to Prime Health Partners (owned by marketer Bebot Bona) (Trial Exhibit 703),

totaling $12,031,057.55.

Under the reasoning articulated by both the Sixth Circuit and *Young*, the kickbacks Defendant paid to the above-mentioned companies qualify as indirect proceeds traceable to Defendant's crimes. As the court in *Bradley II* noted, "gross proceeds" means *gross* proceeds"; the eventual or ultimate destination is unimportant. *Young*, at *33, citing *Bradley II*, 969 F.3d at 589.

Should the Court decline to hold Defendant responsible for the entire $35 million in gross proceeds obtained from the kickback conspiracy, then the Court should find that Defendant, as the ringleader of a massive kickback conspiracy, must forfeit all kickbacks paid and received, resulting in a forfeiture money judgment of approximately $12,031,057.55.

C. **Payments Directly to Defendant Are Forfeitable**

The United States respectfully submits that a forfeiture money judgment based solely on the amounts deposited directly into Defendant's personal bank accounts does not represent the gross proceeds obtained from his kickback conspiracy. However, the following information is provided out of an abundance of caution. The kickback conspiracy and subsequent substantive violations occurred during the period of January 2016 through July 2021. (PSR ¶ 5). Defendant personally received at least $1,672,808.09 in compensation and other payments from Crestar and Advanta during that period.

Defendant purchased Crestar Labs in February 2016. (PSR ¶ 6(c)). From between July 2018 to June 2021, Crestar paid Defendant $1,014,035.97 in salary and other distributions from

Crestar Labs. (Trial Exhibit 709, Payments from Crestar Labs to Fadel Alshalabi). Defendant purchased Advanta Labs in December 2019, and maintained control over the lab even after later putting the company in the name of another person. (PSR ¶¶ 64, 69(h)). Advanta Labs submitted claims for genetic tests based on referrals procured from the kickback conspiracy. From February 19, 2021 to May 14, 2021, Advanta Labs paid Defendant approximately $658,772.12. (Trial Exhibit 701.)[1] The payments were deposited directly in the Alshalabi's personal bank account, SUN *1632. Using this approach, $1,672,808.09 is forfeitable as proceeds under 18 U.S.C. § 982(a)(7).

To reiterate, a forfeiture money judgment of $1,672,808.09 is an ultra-conservative estimate of the proceeds that Defendant personally received from the kickback conspiracy. As previously explained, Defendant was the leader, organizer and controller of the kickback conspiracy and funds; the appropriate measure in this case is what he obtained (gross proceeds and property traceable to his offenses).

IV. **CONCLUSION**

The United States submits that the gross proceeds and property traceable to Defendant's crimes is $35,609,979.20. The pervasive fraud was integral to every Medicare and Medicaid payment Crestar and Advanta received.

A proposed Preliminary Order of Forfeiture will be provided to the Court upon completion of the sentencing hearing.

---

[1] Trial Exhibit 701 includes costs allegedly expended Defendant to purchase and set up the Advanta Labs. The United States maintains Defendant is not entitled to a set-off for these expenses, consistent with *Betro*, at *4. As the evidence demonstrated at trial, Defendant utilized proceeds from the crime to continue to purchase labs throughout the conspiracy, including Karemore, Martis, and Advanta.

Respectfully submitted,

ROBERT E. MCGUIRE
Acting United States Attorney for the
Middle District of Tennessee


 s/ *Sarah K. Bogni*
Sarah K. Bogni
Robert S. Levine
Assistant United States Attorneys
719 Church Street, Suite 3300
Nashville, Tennessee 37203-6940
Telephone: (615) 736-5151
Email: sarah.bogni@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that this Motion will be served electronically via the Court's electronic filing system on all counsel of record, this 23rd day of June 2025.

/s/Sarah K. Bogni
SARAH K. BOGNI